1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA

2                  ATLANTA DIVISION

3  UNITED STATES OF AMERICA,      :
                        :

4  vs.                      :  DOCKET NUMBER
                        :  1:20-MJ-0943 & 1:20-CR-0466

5  RICHARD TYLER HUNSINGER,     :
                        :  ATLANTA, GEORGIA

6          DEFENDANT.       :  NOVEMBER 10, 2020

7

8  **TRANSCRIPT OF AUDIO-RECORDED PRELIMINARY AND DETENTION HEARING**

9                    **PROCEEDINGS**

10      **BEFORE THE HONORABLE LINDA T. WALKER**

11         **UNITED STATES MAGISTRATE JUDGE**

12

13

14

  APPEARANCES OF COUNSEL:

15

      **FOR THE GOVERNMENT:**

16

      RYAN K. BUCHANAN

17     UNITED STATES ATTORNEY'S OFFICE

18

      **FOR THE DEFENDANT:**

19

      JOHN R. LOVELL

20     JOHN R. LOVELL, ESQ., P.C.

21

22     *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*
              *TRANSCRIPT PRODUCED BY:*

23

  *OFFICIAL COURT REPORTER:*     *SHANNON R. WELCH, RMR, CRR*

24                        *2394 UNITED STATES COURTHOUSE*
                        *75 TED TURNER DRIVE, SOUTHWEST*

25                        *ATLANTA, GEORGIA  30303*
                        *(404) 215-1383*

1              **I N D E X   T O   P R O C E E D I N G S**

2

      **WITNESS**                                    **PAGE**

3
      SPECIAL AGENT NATHAN BURNHAM
4
          Direct Examination
5            By Mr. Buchanan                             5
          Cross-Examination
6            By Mr. Lovell                               7

7      ROBERT HAWKINS HUNSINGER

8          Direct Examination
             By Mr. Lovell                              26
9          Cross-Examination
             By Mr. Buchanan                            33
10
                              *  *  *
11
       CERTIFICATE                                      57
12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; November 10, 2020.)** |
| 3 | COURTROOM DEPUTY CLERK:  The Magistrate Court for the |
| 4 | Northern District of Georgia is now in session, the Honorable |
| 5 | Linda T. Walker presiding. |
| 6 | THE COURT:  Please be seated. |
| 7 | The Court calls the case of the United States of |
| 8 | America vs. Richard Tyler Hunsinger.  This is Criminal |
| 9 | Complaint Number 1:20-MJ-0943. |
| 10 | We have appearing on behalf of the Government Ryan |
| 11 | Buchanan.  And appearing on behalf of the defendant, we have |
| 12 | John Lovell. |
| 13 | We are here this afternoon for a detention hearing -- |
| 14 | we are having both preliminary and detention or just a |
| 15 | detention? |
| 16 | MR. LOVELL:  Both, Your Honor. |
| 17 | THE COURT:  Okay.  For a preliminary hearing and |
| 18 | detention hearing. |
| 19 | Okay.  Is the Government ready to proceed? |
| 20 | MR. BUCHANAN:  Yes, Your Honor. |
| 21 | THE COURT:  Okay.  Mr. Lovell, are you ready to |
| 22 | proceed on behalf of the defendant? |
| 23 | MR. LOVELL:  Judge, I just want to point out that we |
| 24 | have maybe a dozen or more other people that would like to be |
| 25 | here to witness this.  I don't know if there is a way to use a |

```
 1   larger courtroom or if there is some way to accommodate them.

 2          They have all come here to support Mr. Hunsinger and

 3   to be present.

 4          THE COURT:  As a result of the pandemic, in March the

 5   Court has decided -- most magistrate judges, we are only

 6   allowing ten people in.  We have stretched that a little to 12,

 7   13 here or there.

 8          But no.  We should have -- if we had had prior

 9   notice, we probably could have moved it to a larger courtroom.

10   But we have to go with what we have now.  So this is it.

11          And so just for -- this has nothing to do with this

12   particular case or this defendant.  This has been our policy

13   throughout the pandemic.

14          So are you ready to proceed?

15          MR. LOVELL:  Yes, Your Honor.

16          THE COURT:  Okay.

17          Mr. Buchanan?

18          MR. BUCHANAN:  Your Honor, with respect to probable

19   cause, the United States called Special Agent or Task Force

20   Agent Nathan Burnham.

21          THE COURT:  Okay.

22          COURTROOM DEPUTY CLERK:  If you would, raise your

23   right hand please to be sworn.  Thank you.

24                    (Witness sworn)

25          COURTROOM DEPUTY CLERK:  Thank you, sir.  You can
```

1    take your seat.

2          And if you would, please, sir, state your full name

3    for the record and spell your last name for the Court.

4          THE WITNESS:  Sure.  It is Nathan Allen Burnham.

5    Last name is spelled B-U-R-N-H-A-M.

6          COURTROOM DEPUTY CLERK:  Thank you, sir.

7          THE COURT:  You may proceed.

8          MR. BUCHANAN:  Thank you.

9       Whereupon,

10                   SPECIAL AGENT NATHAN BURNHAM,

11       after having been first duly sworn, testified as follows:

12                         DIRECT EXAMINATION

13   BY MR. BUCHANAN:

14   **Q.**   Special Agent Burnham, how are you employed?

15   **A.**   I'm a special agent with Homeland Security Investigations

16   here in Atlanta, Georgia.

17   **Q.**   And how long have you been with HSI?

18   **A.**   Since 2008.

19   **Q.**   And are you currently assigned to a different agency?

20   **A.**   I am.  I am currently assigned to the FBI's joint

21   terrorism task force.

22   **Q.**   And how long have you been with the task force?

23   **A.**   Since June.

24   **Q.**   And during the course of your employment with the task

25   force, have you participated in an investigation involving some

1  vandalism and a fire that occurred at the DHS building on

2  July 25th of 2020?

3  **A.**   Yes, sir.

4  **Q.**   And you are familiar with how that investigation has

5  proceeded?

6  **A.**   Yes, sir, I am.

7  **Q.**   And during the course of that investigation, did you

8  participate or are you aware of the arrest of Richard Tyler

9  Hunsinger?

10 **A.**   Yes, sir.

11 **Q.**   And do you see Mr. Hunsinger in court today?

12 **A.**   I do.

13 **Q.**   Please identify him by a bit of clothing that he is

14 wearing.

15 **A.**   He is the gentleman sitting at the defense table with the

16 orange jumpsuit.

17 **Q.**   And, Special Agent Burnham, during the course of your work

18 in this case, did you draft a complaint affidavit and sign a

19 criminal complaint related to Richard Tyler Hunsinger?

20 **A.**   Yes, sir, I did.

21 **Q.**   And was that complaint then sworn before Judge Walker?

22 **A.**   Yes, sir.

23 **Q.**   And to the best of your knowledge and as the investigation

24 has gone on since you signed that complaint, are there any

25 facts that you have learned that would cause you to believe

1    that that complaint needs to be adjusted or edited in any way?

2    **A.**   No, sir.

3            MR. BUCHANAN:  No more questions related to probable

4    cause, Your Honor.

5            THE COURT:  Mr. Lovell, your witness.

6            MR. LOVELL:  Thank you, Your Honor.

7            THE COURT:  Uh-huh (affirmative).

8                          CROSS-EXAMINATION

9    BY MR. LOVELL:

10   **Q.**   Good afternoon, Investigator Burnham.  We met previously

11   beforehand.  My name is John Lovell, and I do have a few

12   questions for you.

13   **A.**   Sure.

14   **Q.**   First, I would like to talk to you a little bit about the

15   Federal Protective Services inspector, K.C., who we have

16   identified by -- those are his initials, K.C.; is that correct?

17   **A.**   Correct.

18   **Q.**   All right.  And where was K.C. -- of course, we're talking

19   about your affidavit on July 25th pertaining to activities that

20   occurred allegedly on July 25th of 2020, just to set the time;

21   correct?

22   **A.**   Correct.

23   **Q.**   All right.  Where was -- and even to be more specific,

24   we're talking about something that is alleged to begin about at

25   11:30 P.M.?

**A.**    Yes, sir.  That's accurate.

**Q.**    All right.  At about 11:30 P.M., is it correct that some protestors arrived at the subject location, which I believe is 180 Ted Turner?

**A.**    Yes.

**Q.**    All right.  And do you know where K.C. was in the building at 180 at 11:30 on the 25th of July?

**A.**    I know that he was inside the building at 180 Ted Turner. But I'm not familiar with exactly where his precise location was at 11:30, no, sir.

**Q.**    All right.  And do you know what caused him -- what drew his attention to the -- to the disturbance outside the building?

**A.**    Well, I can only surmise that the broken windows and lasers that were being portrayed into the building drew his attention.

**Q.**    Okay.  So when the lasers were initially being shown on the building, he was not visible?  He was not at a window, but that drew his attention to the window; is that correct?

**A.**    I can't say that, no.

**Q.**    Okay.  You don't know?

**A.**    I don't know.

**Q.**    Okay.  Do you know whether people outside were able to observe that there was a human being located in the building on July 25th, 2020, at 11:30 P.M.?

**A.**   I couldn't speak to what the protestors saw, no, sir.

**Q.**   Okay.  There were no signs that were indicating that there was a person conducting live surveillance at that time; is that correct?

**A.**   I'm unaware of any signage that would say that there are persons in the building, no, sir.

**Q.**   Okay.  And the building was dark?

**A.**   No.  It had lights on.

**Q.**   All right.  So when -- as these lights were lit up from the street, are you aware of whether Mr. -- whether K.C. was visible from the street?

**A.**   I do not know that.

**Q.**   So as it stands today, you can't tell the judge whether an individual on the street would have had reason to know that there was an occupant in the building at 180; is that correct?

**A.**   There was an occasion in which the cameras do depict an officer opening the door and looking outward towards the crowd. But I can't -- again, I can't stipulate or know what possibly the protestors saw at that point.

**Q.**   And is this -- is this -- was there a point in time when the perimeter of the building was breached?

**A.**   Yes, sir.

**Q.**   All right.  And when the door was opened by the officer, was that prior to or after the breaching of the building?

**A.**   I can't recall.

1    **Q.**   But you have watched that?

2    **A.**   I have.

3    **Q.**   But you don't recall when it happened?

4    **A.**   I can't remember the time line of events in which that

5    occurred.

6    **Q.**   Okay.  All right.  So your memory is less than perfect on

7    these events; is that correct?

8    **A.**   On that particular fact, yes.

9    **Q.**   All right.  Let me direct your attention then to

10   Paragraph 18 of your affidavit where you allege that the car

11   was identified by a license plate reader, which you abbreviate

12   with LPR.  So we will feel free to refer to that by those

13   initials.

14        And you write, quote, a few hours before the start of the

15   damage, unquote, the LPR picked up a vehicle that was

16   registered to one Kathryn Richards; is that correct?

17   **A.**   That's correct.

18   **Q.**   All right.  And Kathryn Richards you have identified as

19   the significant other of my client?

20   **A.**   Yes, sir.

21   **Q.**   Okay.  Can you be more -- it is funny.  I have this

22   discussion with my wife on what a few means.  I think of it as

23   three.  And she thinks of it as up to ten.

24   **A.**   Sure.

25   **Q.**   How do you define a few or in this case a few of?

**A.**   I think the time may have been delineated in the complaint itself.  But I think it was within a two- to three-hour period prior to the event.

**Q.**   All right.  If I -- and I may have missed it.  Fortunately I had the good sense to mark it as Paragraph 18.  So I'm going to go take a look at that again.

And I'm sorry.  You do delineate that as 8:49 P.M.

So just under three hours prior to the incident?

**A.**   That would be accurate.

**Q.**   Okay.  Turning then your attention -- actually staying then on the LPRs, were you able to identify whether there were any LPRs that were any closer to the subject building at 180 Ted Turner?

**A.**   Well, if there were, I'm not aware of any.

**Q.**   Okay.  And how did you -- did you personally look through the data and search vehicles that passed under these LPRs at about this time in the evening?

**A.**   No, sir, I did not.

**Q.**   Someone from the Atlanta Police Department did it?

**A.**   I believe that is correct, yes, sir.

**Q.**   All right.  And is that --

**A.**   Or another member of the task force.

**Q.**   I understand.  Someone other than you?

**A.**   Someone on the investigative team, yes, sir.

**Q.**   Okay.  So you just received a report that summarized --

1   summarized --

2   **A.**   I received information that that was, in fact, the case;

3   that that point was read by the license plate reader at that

4   time.

5   **Q.**   Okay.  All right.  And you are not aware of whether there

6   were -- and that reader wasn't -- and I'm going to read from

7   Paragraph 18.

8        That reader, that LPR, was approximately four miles from

9   the DHS building?

10  **A.**   I believe that is correct, yes, sir.

11  **Q.**   And I have used -- I have described it as 180 Ted Turner

12  Drive.  And that is interchangeable with the DHS building?

13  **A.**   Correct.

14  **Q.**   Those terms are referring to the same building?

15  **A.**   Yes.

16  **Q.**   All right.  All right.  I want to ask you -- staying right

17  in that area of the affidavit at Paragraph 19, you indicate

18  that you acquired the records of Mr. Hunsinger for his Twitter

19  account.

20       Is that accurate?

21  **A.**   Yes, sir.

22  **Q.**   And was that acquired pursuant to a warrant?

23  **A.**   No, sir.  That was, I believe, by a grand jury subpoena.

24  **Q.**   Okay.  Grand jury subpoena.

25       And without discussing the content of your testimony

1    there, is it then -- have you testified in front of a grand

2    jury?

3    **A.**    I have not.

4    **Q.**    Okay.  And I'm not going to go any further into grand

5    jury.

6         Let's see.  Similarly, the hospital was approached and

7    records were gathered from the hospital pertaining to patients

8    that were treated for lacerations on the evening of July 25th

9    or perhaps the early morning hours of July 26th; is that

10   correct?

11   **A.**    Yes, sir.

12   **Q.**    All right.  And was that gathered pursuant to a warrant?

13        MR. BUCHANAN:  Objection.  It is not relevant to

14   probable cause, Your Honor.

15        THE COURT:  Sustained.

16   **Q.    (BY MR. LOVELL)**  Are you familiar with the requirements of

17   the Health Insurance Portability and Accountability Act?

18        MR. BUCHANAN:  Same objection, Your Honor.

19        THE COURT:  (Unintelligible) respond to the question.

20   **Q.    (BY MR. LOVELL)**  It is more commonly -- the Health

21   Insurance Portability and Accountability Act, more commonly

22   referred to by the acronym HIPAA.

23        Are you familiar with that?

24   **A.**    Generally.

25   **Q.**    All right.

```
 1              MR. BUCHANAN:  Same objection.

 2              THE COURT:  Sustained.

 3    Q.   (BY MR. LOVELL)  All right.  We're going to talk a little

 4    bit about the -- some of the Tweets that you have reported in

 5    your affidavit.

 6         At Paragraph 24, you quote a Tweet that allegedly came

 7    from an account controlled by Mr. Hunsinger.  And the Tweet

 8    reads, quote, the police must be treated as occupiers and

 9    engaged with as such.  We are in for a long, hot summer and a

10    year that still has to fully unfold.

11         And then continues on the same date, August 28th, with a

12    quote that says, set fire to the next white -- and I want you

13    to focus on this second quote that I'm reading now.  Quote, set

14    fire to the next white anarchist autonomous zone that pops up.

15    Throw Molotovs into any white anarchist-led squat you come

16    across.  Treat these anarcrakkkas like cops because ain't no

17    reason why colonizers is being given passes to reclaim space on

18    stolen land just to kill us.

19         Now, that quote you allege was a re-Tweet from

20    Mr. Hunsinger; is that correct?

21    A.   I believe that is accurate, yes, sir.

22    Q.   And do you have any -- are you able to explain to me what

23    exactly the significance of that quote is -- what it means?

24    A.   The significance of what the writer wrote?

25    Q.   Yes.  What does it mean?
```

**A.**   I couldn't guess what his intent was in stating that.

I think the purpose of us putting that into our complaint was the fact that it references the use of Molotov cocktails, to which he affirmatively responded to.

**Q.**   But, otherwise, you have -- the general content of it you don't have any interpretation?  You are not able to offer any interpretation of it?

**A.**   I am not, no, sir.

**Q.**   Okay.  Let me then direct your attention to Paragraph 23. And I'm going to quote you again.  Minneapolis police have killed again.  Rioting is spreading in the city without hesitation.  They will kill and kill as long as they exist.  If the system cannot stop them, we will.  Time's up.

When they refer to the -- in the third sentence -- and, again, this was a re-Tweet?  Let me establish that first.  This was a re-Tweet?

**A.**   I don't recall specifically if that was a re-Tweet or if that was Mr. Hunsinger's particular Tweet.  I would have to refresh my memory with the complaint.

**Q.**   Do you have your copy of the complaint --

**A.**   I don't have it with me, no, sir.

**Q.**   -- with you?  May I -- I can give you mine.  Or it might expedite things if yours is at the table if I hand you your own.

MR. LOVELL:  May I approach, Your Honor?

1          THE COURT:  Yes, you may.

2    **Q.   (BY MR. LOVELL)**  I have been handed by Mr. Buchanan what

3    appears to be another copy.  I think it is yours.  I'm handing

4    that to you.

5          And I'm going to direct your attention now to the top of

6    Page -- toward the top of Page 5 at Paragraph 23.  Let's just

7    go through that line by line.

8          Minneapolis police have killed again.  Now, historically,

9    do you recognize the allegation or the reference to the

10   Minneapolis police having killed again?

11   **A.**   I do.

12   **Q.**   And that is a -- what is that a reference to?

13   **A.**   I believe that is a reference to the death of George

14   Floyd.

15   **Q.**   All right.  And, now, is that -- in your view, was that

16   the death of George Floyd or was that the murder of George

17   Floyd?

18          MR. BUCHANAN:  Objection, Your Honor.  This is

19   completely irrelevant to probable cause.

20          THE COURT:  Sustained.

21   **Q.   (BY MR. LOVELL)**  The next sentence reads, rioting is

22   spreading in the street without hesitation.

23          And is it safe to say, Agent, that that is a reference to

24   what was going on in Minneapolis?

25   **A.**   And elsewhere.

1    Q.   Okay.  And then the next sentence, the third sentence,

2    reads, they will kill and kill as long as they exist.

3        That is a reference to the police; correct?

4            MR. BUCHANAN:  Same objection.

5            MR. LOVELL:  Judge, this is one I would like to be

6    heard on.  This is -- he thought this was important enough to

7    place it in that it helps establish probable cause.  We need to

8    understand --

9            THE COURT:  But you are asking him what someone has

10   re-Tweeted that someone else said what does it mean.

11           MR. LOVELL:  I want to know why he thinks it is

12   relevant towards probable cause.

13           THE COURT:  Okay.  You can ask him that, why he

14   thought it was relevant.

15           MR. LOVELL:  Okay.

16   Q.   (BY MR. LOVELL)  Why do you think that third sentence,

17   they will kill and kill as long as they exist -- why is that

18   relevant?

19   A.   My interpretation is that they are being -- is clearly the

20   police.

21   Q.   And then the next line, isn't it true that it expresses

22   some frustration that the system is not stopping the police

23   from killing?

24           MR. BUCHANAN:  I would object to counsel trying to

25   characterize what the Tweets mean.

1          THE COURT:  Overruled.  I'll let him -- if he can

2    respond, he can respond.

3    **A.**   Would you please restate the question.

4    **Q.   (BY MR. LOVELL)**  Would you like me to repeat that?  Yes,

5    sir.

6          The fourth sentence in that paragraph -- in that quote

7    says, if the system cannot stop, them we will.

8          And that is a reference to the frustration that the system

9    has not stopped the police from killing?

10   **A.**   Well, I can't speak to what their frustration is.  I can

11   speak to what the sentence says, which is, if the system cannot

12   stop them, we will.

13   **Q.**   Okay.  I understand that.

14          MR. LOVELL:  All right.  Thank you, sir.  I have no

15   further questions.

16          THE COURT:  Okay.  Do you have any redirect of this

17   witness?

18          MR. BUCHANAN:  Not with respect to probable cause,

19   Your Honor.

20          THE COURT:  Okay.  You may step down.

21          THE WITNESS:  Thank you, ma'am.

22          THE COURT:  Argument regarding -- any other witnesses

23   on probable cause?

24          MR. BUCHANAN:  No, Your Honor.

25          THE COURT:  Okay.  Any argument on probable cause,

```
1    Mr. Lovell?

2              MR. LOVELL:  Your Honor, based upon the standard that

3    is presented here, at this point in time having heard from the

4    witness and we do not have any witnesses to offer in

5    contravention of probable cause today, I don't require the

6    Government to make an argument.  I believe that with the

7    standard that is here the Court will find that there is

8    probable cause.

9              THE COURT:  Okay.  Thank you.

10             The Court finds probable cause as to Count 1, that on

11   or about July 25th, the defendant and others did maliciously

12   damage or attempt to damage by means of a fire a building,

13   vehicle, and other personal or real property in whole or in

14   part possessed or leased to the United States in violation of

15   Title 18 U.S. Code Section 844.

16             Also I find there is probable cause as to the second

17   offense set forth that on or about July 25th, 2020, in the

18   Northern District of Georgia, the defendant, aided and abetted

19   by others, did forcibly assault, resist, impede, intimidate,

20   interfere with a federal officer, that is, a Federal Protective

21   Services inspector, K.C., while he was engaged in the

22   performance of his official duties in violation of Title 18

23   United States Code Section 111.

24             The Court also finds probable cause with regard to

25   the next offense, that on this same date, July 25th, 2020, in
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    the Northern District of Georgia, the defendant, aided and

2    abetted by others, willfully entered and committed a

3    depredation against the property of the United States and an

4    agency thereof in violation of Title 18 U.S. Code Section 1361.

5              We will proceed now to the detention hearing.

6              Okay.  Mr. Buchanan?

7              MR. BUCHANAN:  Thank you, Judge.

8              The United States has moved to detain Mr. Hunsinger

9    while this matter is pending trial because there is not a

10   condition or set of conditions to reasonably assure the safety

11   of the community or his appearance as the trial of this matter

12   moves forward.

13             Your Honor, in working through the items that the

14   Court examined for detention in 18 U.S.C. 3142, I'll start with

15   the weight of the evidence or the seriousness -- nature and

16   circumstances of the offense.

17             Your Honor, the evidence established probable cause

18   that Mr. Hunsinger and others set a building on fire while at

19   least one person was inside it.  I would posit to the Court

20   that there were actually two people there.  There was a

21   security officer there and then the FPS inspector.  But only

22   the FPS inspector gives rise to the assault charge in 18, 111.

23             This is a very serious offense.  There were hundreds

24   of folks who were outside the building at that time.  And so

25   hundreds of folks outside the building and two people inside

1   the building and these -- these items being thrown at and

2   ultimately into the building, that posed significant danger to

3   those folks who were inside the building.

4        So we believe that that first act that the Court

5   considers is actually something that tilts toward detention

6   because of the danger and the circumstances of this offense.

7        The next item the Court considers in 18 U.S.C. 3142

8   is the weight of the evidence against the defendant.  The Court

9   is familiar with the complaint.  This case is not a case that

10  the agents of the Government sort of rushed to quickly.  It was

11  a methodical investigation.

12       Mr. Hunsinger posted an advertisement about this

13  event.  His girlfriend's car was seen in the area before the

14  event.  After the event, his girlfriend's car and an individual

15  fitting his description was seen right out in front of the

16  building while agents were still working on gathering evidence

17  and cleaning up, frankly, from what happened there before.

18       And then the evidence that it was actually

19  Mr. Hunsinger who -- who participated in the front of the

20  building, that weight is -- the weight of the evidence is

21  significant.

22       We know from the investigation that a person suffered

23  a cut because there was blood in and around that building and

24  on items that were inside that building.  We know from the

25  investigation that Mr. Hunsinger later received treatment for a

1    laceration at a local hospital.

2         And, Your Honor, I've got some exhibits that I will

3    show that will assist the Court in understanding how the

4    Government came to that conclusion.  I've sent a copy of these

5    and given a copy of these to Mr. Lovell.  I'll mark them, Your

6    Honor, as Government's Exhibits 1 through 6.

7         So, Your Honor, the argument -- or to sort of rebut

8    the argument regarding whether or not these were sort of

9    peaceful protests and Mr. Hunsinger might have just happened to

10   be in the wrong place at the wrong time, that is rebutted by

11   these exhibits that I'm about to hand the Court.

12        In these exhibits in Government's 1, you will see an

13   individual who is dressed in all black.  He has white shoes and

14   white gloves.

15        Government's Exhibit 2, that person is seen lighting

16   something on fire.  Same gloves, same white shoes.

17        Exhibit 3, that person had the item lit on fire in

18   his hand.  Same gloves, same shoes.  And the Court is able to

19   see that there is a green laser being shined into the building.

20        And then on Government's Exhibit 4, this person is

21   preparing to toss that item that is lit on fire.

22        Government's Exhibit 5 is a picture of Mr. Hunsinger

23   at Grady Hospital -- at Grady Hospital.  He has changed pants

24   at least, but the white shoes are still visible from the

25   pictures before.

1          And then Government's Exhibit 6 just shows a little

2    bit of the damage that was caused.  And it shows the exterior

3    of that building was, in fact, damaged and it was -- it was

4    broken.

5          So, Your Honor, the United States would move with

6    respect to detention Government's Exhibits 1 through 6 for the

7    Court's consideration.

8          THE COURT:  Okay.

9          MR. LOVELL:  If I may, Judge, I have five.  Let me

10   just see which one I'm missing and take a look at it.

11         THE COURT:  Okay.

12         MR. LOVELL:  Mr. Buchanan sent them to me via email

13   as well.  So it looks like it is kind of repetitive what I

14   don't have.  It is a little bit different.

15         I have no objection --

16         THE COURT:  Okay.

17         MR. LOVELL:  -- to the admissibility of these for the

18   purposes of this hearing.

19         THE COURT:  Government's Exhibits 1 through 6 are

20   admitted.

21         MR. BUCHANAN:  So, Your Honor, we believe that

22   Government's Exhibits 1 through 6 underscore, one, the

23   seriousness of it.  You see this person -- we believe it is

24   Mr. Hunsinger -- with a lit item in his hand.

25         The complaint notices or references that items in

1    the -- there were sort of Molotov -- these improvised

2    explosives that were located inside the building.  And then,

3    Your Honor, we again highlight the idea and the fact that there

4    were people inside this building when it happened.

5            So we believe the weight of the evidence is another

6    item that tips toward detaining Mr. Hunsinger while this matter

7    is -- is under -- is pending trial.

8            Following, Your Honor, we believe that the danger

9    Mr. Hunsinger poses, the evidence is toward detention.  We

10   agree with the pretrial services report that noted that there

11   was not a set of conditions to assure the safety and

12   Mr. Hunsinger's appearance.

13           We note that in addition to there being this arson

14   that he participated in he talked about it.  It wasn't a

15   secret.  He openly talked about -- I believe in the complaint

16   that re-Tweet mentioned setting fire to stuff.  It mentioned

17   throwing Molotov cocktails at things.  He posted the

18   advertisement to gather and rally people before this event

19   happened.  And then he rode by presumably afterwards to survey

20   what happened.

21           So his participation in this has not been a secret at

22   all.  And just so we are absolutely clear and why I mean his

23   participation in this, I mean his participation in three

24   things:  His participation in the assault on the officer who

25   was in the building, his participation in the arson of the

1    building, and his participation in the depredation of the

2    government property.

3           This case isn't about anything else that

4    Mr. Hunsinger has done.  It is about those three things, his

5    participation in these things that are prohibited by federal

6    law.

7           And so, Your Honor, we steadfastly hold our position

8    that there is not a set of conditions that will assure the

9    safety of the community and Mr. Hunsinger's appearance.  And so

10    he must be detained while this matter is pending trial.

11           THE COURT:  Okay.  Thank you.

12           Okay.  Mr. Lovell?

13           MR. LOVELL:  Thank you, Your Honor.

14           THE COURT:  Uh-huh (affirmative).

15           MR. LOVELL:  Judge, this morning -- I'm sorry -- this

16    afternoon, I met Robert Hunsinger.  And through apparently a

17    technological glitch, he had sent me a letter from him and his

18    wife on behalf of their son.  I do not have copies.  So what

19    I'm going to do is -- and I also have a copy of my client's

20    expired passport.

21           I'm just going to let the Government look at those

22    now.  As the only copy I have I'm going to tender in a few

23    minutes.

24           I do have one witness.  I would like to call my

25    client's father, Robert Hunsinger.

```
 1                THE COURT:  Okay.  Thank you.  You may call him.

 2                MR. LOVELL:  Mr. Hunsinger, if you can make your way

 3    around here the best you can.  Everything is a little bit

 4    tight.

 5                COURTROOM DEPUTY CLERK:  Okay.  Please raise your

 6    right hand, please, to be sworn.

 7                        (Witness sworn)

 8                COURTROOM DEPUTY CLERK:  Thank you, sir.  You can

 9    take your seat.

10                And if you would, please, sir, just state your full

11    name for the record.

12                THE WITNESS:  Robert Hawkins Hunsinger.

13                COURTROOM DEPUTY CLERK:  Thank you.

14                THE WITNESS:  H-U-N-S-I-N-G-E-R.

15                COURTROOM DEPUTY CLERK:  Thank you.

16         Whereupon,

17                        ROBERT HAWKINS HUNSINGER,

18         after having been first duly sworn, testified as follows:

19                        DIRECT EXAMINATION

20    BY MR. LOVELL:

21    Q.   Mr. Hunsinger --

22    A.   Yes.

23    Q.   -- are you nervous?

24    A.   A little bit.

25    Q.   All right.  Do you need a water or anything?
```

```
1    A.   No.  I'm fine.  Thank you.

2    Q.   Just let me know.

3         You are Richard Hunsinger's father?

4    A.   Yes.

5    Q.   Correct?

6         And his mother -- what is his mother's name?

7    A.   The mother's name is Tonda Ann Hunsinger.

8    Q.   Is she here today?

9    A.   No, she is not.

10   Q.   Where do y'all reside?

11   A.   Springfield, Virginia, just outside Washington, D.C.

12   Q.   And where is -- what is your wife's name?

13   A.   What is her name?

14   Q.   Yes.

15   A.   Tonda Ann Hunsinger.

16   Q.   And why is she not here today?

17   A.   Our daughter, Richard's younger sister, is pending surgery

18   in December.  And we are both trying to avoid as little contact

19   and risk COVID as possible so that we can be with her during

20   that surgery.

21   Q.   Okay.  How -- how old are you, sir?

22   A.   I'm 62.

23   Q.   All right.  And are you employed?

24   A.   No.  I'm retired.

25   Q.   All right.  Would you tell -- would you tell the Judge,
```

1   Judge Walker, about your career.  Where were you educated?

2   **A.**   I was educated here in Georgia at the University of

3   Georgia.  I was a Georgia citizen -- or resident initially.

4        After graduation -- well, actually before graduation,

5   between high school and college, I joined the U.S. Air Force.

6   I worked in intelligence.  I was a Russian linguist.

7        After four years of active duty, my wife and I returned to

8   Athens to go to school.  After graduating from the University

9   of Georgia, we both reentered the Air Force as officers.  We

10  both went back into intelligence.

11       I spent the remainder of my career in both the Air Force

12  and DOD as an intelligence officer, roughly 40 years total,

13  first as a linguist and then as an analyst and then various

14  staff positions as well throughout my career.

15  **Q.**   And to be clear, you are retired, and you are 62.  You

16  retired at what age?

17  **A.**   At 62.

18  **Q.**   And your wife had a similar career track, and she is now

19  retired?

20  **A.**   Yes.  She retired at 60, two years before I did.

21  **Q.**   All right.  Now, I would like to -- of course, you know

22  why we are here.  We are here because right now in particular

23  to ask the Judge to set bond for your son.

24       Can you tell the Judge a little bit about your son?

25  **A.**   Richard has always been a very inquisitive, very talented,

1   very bright individual.  He has never been an issue as far as

2   behavior or any type of legal problems in high school or

3   college.

4       He graduated both high school and the University of

5   Georgia with honors.  Graduated the University of Georgia magna

6   cum laude, Phi Beta Kappa.

7       He is very talented.  He's played the guitar since he was

8   in grammar school, and he has a dual major in music performance

9   and music composition.  Plays classical guitar.

10      In addition to, he has always been an avid reader, always

11  been intellectually curious, always been very good with people.

12  He has always had a wide circle of friends.  People recognize

13  him for his sensitivity and his concern for themselves and

14  others around him.

15      He's -- he's just always been well liked.  We have

16  always -- we have never had a problem with him.  We always

17  figured that we wanted for him what every family wants for

18  their kids:  Find someone to love, find a vocation that they

19  enjoy and that they are good at, and lead a happy life.

20      We would hope that Richard gets that opportunity.

21  **Q.**   Mr. Hunsinger, you and your wife, Tonda, drafted a letter

22  to me on behalf of your son -- really it is to Judge Walker.

23  But you intended to email it to me; is that correct?

24  **A.**   Yes.  We emailed it -- actually, I left -- we finished it

25  up Sunday night.  And my wife thought she had emailed it

1   immediately after that.  And then I left for here yesterday.

2   Drove down on Monday.

3   **Q.**   And you and I spoke just this afternoon, and we realized

4   that I had just received that letter for the first time?

5   **A.**   Yes.

6          MR. LOVELL:  All right.  And I have given the

7   Government a chance to see this.  And I'm going to tender as

8   Defense Exhibit 1 at this point in time a letter to join the

9   other 14 letters that I have already submitted on behalf of

10  the -- Mr. and Mrs. Hunsinger.

11         MR. BUCHANAN:  No objection.

12         THE COURT:  Okay.  Defendant's Exhibit 1 --

13         MR. LOVELL:  Yes, Your Honor.

14         THE COURT:  -- is admitted.

15         MR. LOVELL:  And I'll bring it up in just a second.

16  I'm going to do two at once, if that is okay.

17         THE COURT:  Uh-huh (affirmative).  That's fine.

18  **Q.   (BY MR. LOVELL)**  The next document I have, sir, is an

19  exhibit that I have marked as Defendant's Exhibit 2.

20         Does your son have a valid passport at this time?

21  **A.**   No, he does not.  He hasn't had a valid passport for eight

22  years.

23  **Q.**   All right.  And your wife has kept a copy of his -- what

24  appears to be quite an old passport; is that correct?

25  **A.**   Yes, she has.

1    Q.    I'm looking at this picture, and I think he was telling me

2    he was in tenth grade.

3    A.    That was between his ninth and tenth grade.

4          MR. LOVELL:  And similarly, Judge, I have allowed the

5    Government to see this.  And I would now like to tender

6    Defendant's Exhibit 2, which is a photographed copy of the

7    passport of Richard Hunsinger -- the expired passport.

8          MR. BUCHANAN:  No objection.

9          THE COURT:  Government's Exhibit 1 and 2 are both

10   admitted.

11   Q.    (BY MR. LOVELL)  Mr. Hunsinger, I want to be clear about

12   one thing.  You indicated that your son never had any problems

13   with the law in high school and college.

14         Are you aware that he was arrested in 2017?

15   A.    Yes, sir, I was aware of that arrest.

16   Q.    Okay.  And, actually, he was arrested three times in that

17   year of 2017?

18   A.    Yeah.  I wasn't aware of all three arrests.  I had

19   suspected that -- I thought that there were others.  But I only

20   knew of really just the one.

21   Q.    Okay.  Now, let me ask you then really to get down to

22   brass tacks of why we are here today:  Are you confident that

23   your son will not pose a threat to any individual or member of

24   the community?

25   A.    I am very confident.

32

1   **Q.**   All right.  And, similarly, it is important to the Court

2   that your son come to court.  Are you confident that your son

3   will appear in court as directed?

4   **A.**   My experience is that Richard has always met his

5   obligations, that he -- he does not walk away from

6   responsibilities.  If he is asked or ordered to appear, he will

7   appear.

8   **Q.**   Now, Mr. Hunsinger, you are his father, and it is easy for

9   you to say that.  So I'm going to ask you another question,

10  sir.

11  **A.**   Yes.

12  **Q.**   Are you willing -- you are retired.  I take it you have

13  saved some money during the course of your career?

14  **A.**   Yes.

15  **Q.**   Are you willing to pledge your own assets to this Court to

16  assure the Court that your son -- to express your confidence

17  that he will be here as directed and not pose a threat to the

18  community?

19  **A.**   Yes.

20  **Q.**   All right.  If the Court were to set bond at $50,000 cash,

21  would you be able and willing to post that money?

22  **A.**   It would take a day or two.  But yes, I would be willing

23  to.

24  **Q.**   And, again, you realize -- or let me be clear.  Do you

25  realize that the Judge will set certain terms and conditions

1    and if your son violates those terms and conditions the Court

2    could order that money forfeited?

3    **A.**   I understand.

4    **Q.**   And you are willing to abide by that and put your own

5    money at risk?

6    **A.**   Yes.

7    **Q.**   All right.  If we think it is a risk.  Obviously you

8    don't.

9            MR. LOVELL:  I have nothing further.  Thank you.

10           THE COURT:  Okay.  Mr. Buchanan, any questions of

11   this witness?

12           MR. BUCHANAN:  Yes, Your Honor.

13                          CROSS-EXAMINATION

14   BY MR. BUCHANAN:

15   **Q.**   Mr. Hunsinger, my name is Ryan Buchanan, and I'm a federal

16   prosecutor working on this -- on this case.

17       Sir, you live in Virginia; correct?

18   **A.**   Yes.

19   **Q.**   Do you know where your son lives?

20   **A.**   He just recently relocated.  He lives up near the Grant

21   Zoo.  I can't recall the exact address off the top of my head.

22   But I looked at it on Google Earth.

23   **Q.**   Have you ever been to his place?

24   **A.**   Not this new place, no.

25   **Q.**   Had you been to his previous place?

34

1    **A.**    Yes.

2    **Q.**    Where did he live before that?

3    **A.**    I don't know the exact address.  But yes, I have been

4    there.  Two or three visits.

5    **Q.**    Do you know with whom he lived?

6    **A.**    Well, previously, he lived with his significant other,

7    Kate.  And then I think at one time they have had other

8    roommates off and on.

9         But I don't ask the details of his everyday.

10   **Q.**    Sure.  And that sort of brings me to my point.  How

11   frequently do you speak to your son?

12   **A.**    Well, recently every day.  But at least every few weeks or

13   months.

14   **Q.**    Every couple of months?

15   **A.**    Yes.

16   **Q.**    So you don't speak weekly?

17   **A.**    No.

18   **Q.**    Okay.  Prior to this morning, when was the last time you

19   saw your son?

20   **A.**    It has been probably a year.  Part of that is because of

21   the pandemic.  You know, I usually get down to Georgia a couple

22   of times a year.  But because of the pandemic, we just haven't

23   been traveling down here.

24   **Q.**    And I believe Mr. Lovell asked you on direct.  You are

25   aware your son was arrested in 2017?

1    **A.**    Yes, I was aware of the arrest.

2    **Q.**    And it was actually three arrests; right?

3    **A.**    Well, apparently.  I knew of the one particularly.  I

4    suspected or thought that there was one or two more.  But I

5    didn't know all the details.

6    **Q.**    Which one did you know about?

7    **A.**    Well, the one at Georgia Southern -- Georgia State College

8    or something.

9    **Q.**    That was willful obstruction of a law enforcement officer

10   is what he was arrested for?  Sound right?

11   **A.**    Sounds about right.

12   **Q.**    And then in May, he was arrested by Georgia State Patrol

13   for preventing or disruption of a General Assembly session or

14   other meeting.  Does that sound familiar?

15   **A.**    I did not know about that one.

16   **Q.**    And then two weeks later also in 2017, he was arrested at

17   Georgia State for criminal trespass.  Were you aware of that

18   one?

19   **A.**    No, I was not aware of that one.

20   **Q.**    I'm sorry?

21   **A.**    No, I was not aware of that one.

22   **Q.**    And all of these happened -- if we lump things like we do

23   nowadays sort of pre- and post-pandemic, these three arrests in

24   2017 were all prior to the pandemic; correct?

25   **A.**    Right.

1   **Q.**   These were prior to the -- the events that followed the

2   death of George Floyd; correct?

3   **A.**   Yes.

4   **Q.**   And so let me ask you this:  Do you follow your son on

5   Twitter?

6   **A.**   No.  I'm not a member of Twitter.

7   **Q.**   And I guess maybe -- were you sitting in court while the

8   special agent was testifying?

9   **A.**   Yes.

10   **Q.**   Okay.  So you are aware that he Tweeted, you know,

11   something to the effect of holy F, this is a major burn shit

12   down moment?

13   **A.**   Well, I wasn't clear whether it was a Tweet or a re-Tweet.

14   **Q.**   Re-Tweet.  Are you aware of that re-Tweet?

15   **A.**   Yes.  I know the re-Tweet.

16   **Q.**   And you learned of it this morning -- this afternoon in

17   court, or you knew of it beforehand?

18   **A.**   I knew of it beforehand because I had seen a copy of the

19   affidavit.

20   **Q.**   Okay.  But you didn't know about it prior to your son's

21   arrest?

22   **A.**   No.

23   **Q.**   And, likewise, for the other references to his Twitter

24   accounts where he re-Tweeted or Tweeted things that said set

25   fire or throw Molotovs or those other things that were

1    obviously important to the agent in investigating an arson, did

2    you know about those things prior to seeing the affidavit?

3    **A.**    No.

4    **Q.**    What's your understanding, Mr. Hunsinger, of what your son

5    is charged with?

6    **A.**    My understanding --

7    **Q.**    Yes.

8    **A.**    -- is he is charged with trespass, vandalizing government

9    property, and assaulting a federal officer.

10   **Q.**    Do you understand he is charged with arson?

11   **A.**    What?

12   **Q.**    Do you understand he is charged with arson?

13   **A.**    And I believe, yes, a case of arson, yeah.  I think that

14   is Count 1.

15   **Q.**    And, Mr. Hunsinger, do you know where your son works?

16   **A.**    He works with ProGeorgia.

17   **Q.**    And what is that, to your understanding?

18   **A.**    My understanding is a nonprofit that helps look after

19   civil right-types needs or helps other nonprofits.  I mean --

20         MR. BUCHANAN:  Nothing else, Your Honor.

21         THE COURT:  Okay.  Anything else of this witness,

22   Mr. Lovell?

23         MR. LOVELL:  No, Your Honor.  Thank you.

24         THE COURT:  Okay.  You may step down, Mr. Hunsinger.

25   Careful.

1          Any other witnesses regarding the detention and bond?

2          MR. LOVELL:  No, Your Honor.

3          THE COURT:  Okay.  Argument regarding bond?

4          MR. LOVELL:  Yes, Your Honor.

5          Judge, there are some things I would like to make

6    clear, first of all.  The re-Tweets that have been discussed

7    that I want to make certain -- I think the Court knows it, but

8    it could have been blurred during the course of these

9    proceedings.  And that is that the events in question occurred

10   on July 25th, and these alleged Tweets -- that is of this year.

11   These alleged Tweets or re-Tweets, to be more exact, occurred

12   more than a month later in August.

13          So I don't think -- and I want to be careful -- that

14   the Government is not saying that these re-Tweets had anything

15   to do with inciting this alleged event on July 25th because the

16   Tweets, again, occurred more than a month later.

17          But I want to also take some issue with some parts of

18   the pretrial services report.  First of all, something that I

19   can -- we can all agree on -- and that is that there are three

20   arrests alleged.  And in the last several minutes, much -- some

21   significance has been placed on these as it pertains to

22   Mr. Robert Hunsinger's knowledge of the details of these

23   arrests.

24          I want to point out to the Court that these arrests

25   were not considered significant by the authorities in Fulton

1    County.  And how do I know that?  Well, first of all, I'm

2    looking at this pretrial services report, and it indicates that

3    they were not prosecuted.  That term expired as a reflection

4    and under law that when three years passes the statute of

5    limitations and charges are not brought on a misdemeanor that

6    the charges expire based upon the statute of limitations.

7         I have gone -- and, actually, they were dismissed --

8    two, perhaps three of them were dismissed long before that

9    because I went and looked at the docket to be certain that

10   there was no history of Mr. Hunsinger not showing up for court.

11   And everything that I saw indicated that he had shown up for

12   court and that the State of Georgia thought so much of these

13   charges that they chose not to prosecute them.

14        So as they are being used here today -- and I think

15   it is very significant the way they are being used.  Because if

16   you look at the last page of the pretrial services report, you

17   have -- beginning on Page 3, you have six different items that

18   are cited in support for the Government's motion.

19        However, if you'll look at 2, 5, and 6, they have

20   found ways -- and I don't criticize.  These are maybe just

21   different boxes that are available to be checked.  So I don't

22   want that to sound as a criticism.  Somebody is trying to do

23   their job.

24        But just the way the bureaucracy works, there are

25   three different ways that are offered to say that he had three

1    arrests, three years ago that were not pursued by the State of

2    Georgia.

3              So, Number 2, we see prior arrests and conviction --

4    convictions.  And first of all, there are no convictions.  So

5    that word is a misstatement.  There are prior arrests and

6    dismissals.

7              Number 5, a pattern of similar criminal activity

8    history.  Well, that's just not accurate.  What is being

9    reported in this report is at worst instances of civil

10   disobedience where there is an arrest made and the authorities

11   chose not to prosecute it.

12             And then, again, in Number 6, it is called a criminal

13   history.  Well, if charges have been dismissed, that is hardly

14   a criminal history.

15             So that is a way of stating the same thing that is

16   built on a very faulty premise three times.  So we jump from

17   four entries to six by virtue of the way that is drafted in a

18   report.

19             And while I'm there -- I don't want to jump around

20   too much.  I want to stay right there at Page 3 towards the

21   bottom because the assessment of nonappearance -- we see an

22   allegation of mental health history, that that is a grounds for

23   viewing nonappearance -- a risk of nonappearance.

24             Well, when we look at the report, it says that this

25   is based on -- and I want to direct your attention to that same

1   page towards the top, the second bold heading, mental health.

2   The defendant did not provide any history of mental health

3   issues.  That is another way of saying he said he had no mental

4   health issues.  It is just worded in a way that is very

5   negative toward my client.

6        According to the Marshals' personal form -- and

7   perhaps that should be personnel form or personal form I guess

8   for him -- the defendant is suicidal.  Well, my client denies

9   that.  He denies that is suicidal.

10        What I can tell you is that I reached out to his

11   court-appointed attorney who met with him on Thursday.  And I

12   asked her about this point-blank.  And that's -- now you'll

13   have to excuse me because I forget Vidhi's last name.  My

14   apologies.

15        THE DEFENDANT:  Joshi.

16        MR. LOVELL:  Joshi.  Thank you.  Vidhi Joshi.

17        I asked her about that.  And she said no, he was very

18   upbeat.  There was no indication of depression.  And that was

19   Thursday.

20        Mr. Hunsinger reached me from the jail -- actually,

21   this call will be recorded.  I don't have it today to play for

22   you today.  But he called me.  And the thing that stuck out in

23   my mind the most -- not having seen this report yet, when he

24   called me on Saturday morning, it struck me that he was so

25   positive because my experience with people who have been

1    arrested is that in the first 48 hours, the first week,

2    sometimes the first couple of weeks, they are very depressed

3    and down because they have been pulled out of their lives as

4    they know it and placed in confinement in a very unusual

5    circumstance.

6           And the thing that really stuck in my mind is this

7    young man is extraordinarily positive and upbeat considering

8    the circumstances that he is under.  He is handling it well.  I

9    was very comfortable with that because I'm always concerned

10   about my clients' mental health.

11          And while we are there at the assessment of

12   nonappearance, it is important to see that, again, criminal

13   history is cited for that as a reason for nonappearance.  So we

14   have got two things that are cited as assessment -- that are

15   cited as risks that this gentleman will not appear in court as

16   directed.  And both of those are built on very infirm -- on a

17   very infirm foundation, again mental health history, and there

18   is absolutely none of it.  Put it up.  If you have got, if you

19   have got some records that contradicts everything else about my

20   client, let us see it.  And criminal history, again, three

21   charges that were dismissed.

22          And, finally, before I leave that section, I want to

23   say that violent extremist, Number 4, marked as a possible

24   terrorist organization, number in NCIC.  That should not be

25   accepted by this Court without some support of it.  We do not

1    have scarlet letters any more in this country.  And if someone

2    wants to make an allegation like that, please put the document

3    up front and center and let's question it.  Let's dig down into

4    it and find out -- allow me a chance to sift through it and to

5    challenge it, as I have done with so many other allegations

6    here.

7            So, Judge, I turn to the -- the brief that I was able

8    to file a few hours before court.  And I want to just review

9    some of the salient points.

10           This is an occasion where the burden -- you know, as

11   I have conceded, the burden on probable cause is difficult.  It

12   is difficult for -- it is easy for the Government to meet their

13   burden.  It is difficult for the defendant to challenge it in

14   this forum.  It is a low burden.

15           However, when we look at the burden for determining

16   whether there is a threat to the community, the Government has

17   the burden.  And they have to demonstrate by -- they have to

18   demonstrate by clear and convincing evidence.  That is a very

19   high burden.  Some judges have said that is 70 percent --

20   70 percent certainty.

21           Well, there's -- but you've -- you have experience

22   with that burden.  You know it is a high burden that no

23   conditions or combination of conditions other than detention

24   will reasonably assure the safety of any other person in the

25   community.

1        Well, let's take a look at that statement.  Let's
2   look at it in this gentleman's life.  Since he has been
3   incarcerated on Thursday, he turned 28.  On Sunday, he turned
4   28.  So we have 28 years of life.  Approximately 27 and three
5   quarters of those years are lived prior to this allegation.

6        And other than civil disobedience, we have somebody
7   who by all accounts has lived a life where he has sought --
8   from reading these letters, Judge, you see that this is
9   somebody who has a heart for the community, who is out there
10  advocating for the homeless, who wears his heart on his sleeve.
11  And he has conducted himself that way throughout his life.

12        And then we have this allegation that shortly after
13  the George Floyd incident when people were upset and they felt
14  like they didn't have a voice and they were in the streets and
15  people were upset and temperatures were high, the allegation,
16  if we accept it for purposes of this hearing that it is
17  accurate -- it was an anomaly, it was an aberration.

18        And then what we have is from July 25th to an arrest
19  in November, over three months, where we return -- and I
20  understand that the Government cites to some re-Tweets.  But as
21  far as actions and not words -- because we still do have the
22  First Amendment alive and well, I think, in this country.  I
23  know we do.  I make that clear -- that this gentleman is again
24  participating in life as a good citizen and upstanding citizen.
25        So when we talk about -- and now we have -- what has

1   changed.  Now we have the intervention of the United States

2   Government.  We have the intervention of the courts.  We have a

3   Court who can impose a bond that will have consequences on

4   Mr. Robert Hunsinger.  We have a Court that can impose

5   conditions that would restrict, that would impose a curfew upon

6   Richard Hunsinger, potentially an ankle monitor, things that

7   can assert -- assure us -- and, by the way, on behalf of my

8   client -- and I have his authority to speak.  When the Court

9   sets bond, hoping that the Court sets bond, trusting that the

10  Court sets bond, he will not participate in any protests just

11  so that -- that is a right that I feel like perhaps the Court

12  would -- might have hesitation about being affirmative in

13  saying I want you to give up that right.

14          But I want to know that -- I want you to know, Judge

15  Walker, that he volunteers to surrender that right.  He will

16  not participate in any protests while he is on bond and while

17  this case is pending.

18          So he can be -- he can have a curfew and be monitored

19  with an ankle monitor to assure this Court that the 28 years of

20  his life, less the allegations of one evening, are what is

21  reliable and not a period of an hour or a half hour but rather

22  the entire 28 years.

23          Now, the other thing, Judge, is that the Government

24  has the burden of proving by a preponderance of the evidence

25  that detention is necessary to reasonably assure the appearance

1    of the defendant at future court proceedings.

2            Well, Judge, again, Robert Hunsinger is confident

3    enough to put up his savings that his son is going to show up.

4    And this Court can impose -- again, put an ankle monitor on

5    him, something to know where he is going.

6            He does not have a passport.  I'll tell him, as I

7    tell all of my clients when it comes to bond, don't ever try to

8    outrun the U.S. Marshal because they are the best.  They are

9    the best at finding people.  And he is not -- he is not

10   inclined to do that.  He's going to face these charges, and I'm

11   going to represent him here in court.

12           Judge, I also want to point out that he does not

13   stand alone in this district.  There have been some similar

14   charges where the Government has sought detention.  And other

15   magistrates in this district have said, you know, Government, I

16   think actually there are some conditions that we can fashion.

17           So in the case of Jesse James Smallwood, very similar

18   charges, including a count of arson.  And arson is the most

19   serious charge here as it pertains to the penalty.

20           Mr. Smallwood was given a bond.  He was released on

21   his own recognizance with a promise to sign up -- with a

22   promise to show up in court.  I attached those conditions that

23   were set by Judge -- that one was Judge Fuller, I believe.  It

24   was here in the Northern District.

25           Similarly, the case of Randall Mellon is a little bit

1    different in that it is a gun count.  But I had the opportunity

2    to speak with his attorney, Nicole Kaplan.  And she told me --

3    it is an interesting case, Judge, because he's a prior

4    convicted felon.  But his prior conviction -- his prior felony

5    that is the underlying felony for this is possession of

6    marijuana, a crime that our federal government doesn't

7    prosecute -- it was felony weight but not a distribution count.

8    It is something that our Government does not prosecute.  I

9    think as of last week we now have four or five more states and

10   jurisdictions that have legalized or decriminalized marijuana.

11   And our federal government isn't even prosecuting that.

12           But they indicted Mr. Mellon for possession of

13   firearms by a convicted felon with a prior conviction of

14   possession of marijuana because they suspected him of agitating

15   disturbances and violence.  And I spoke with Ms. Nicole Kaplan.

16   And she informed me that that was the -- the primary issue that

17   was taken up.  Or that was a large issue.  I don't want to put

18   words in her mouth.  That was a significant issue that was

19   taken up at the bond hearing, the Government's allegation that

20   he posed a threat to civil disturbance, civil violence.

21           But yet in his case -- and he's a prior convicted

22   felon, albeit.  I'll stand by their words -- are pretty --

23   pretty insignificant in the scheme of things felon, and he was

24   given a 50,000-dollar secured bond.

25           Judge, the last thing I would like to point out

1   before I sit down is, as are you, as are the Government, I'm

2   concerned for K.C., the employee who was in the building at

3   that time.  What we didn't hear today is any knowledge -- any

4   assertion that my client or anyone else knew of K.C.'s presence

5   in the building.

6           There was an allegation that people were flashing

7   laser lights in his eyes.  But what we heard on the stand today

8   is that the laser lights drew K.C.'s attention to the window.

9   And that is what brought him to the window, the flashing of

10  laser lights.

11          So in light of the fact that no one knew that the

12  building was occupied, that does seem to be a tenuous count

13  that the Government has here at the very least.  And that does

14  concern me.  I want the Court to know that because when we are

15  talking about intentionally harming humans that is a different

16  story than intentionally harming a building or protesting in

17  that manner.

18          And the evidence here today does not establish --

19  there is not strong evidence that there was an assault on an

20  officer intentionally on July 25th.

21          So, Judge, with that in mind, I ask you to look

22  critically at these recommendations.  I ask you to look

23  critically at the evidence.  I ask you to think about what we

24  are willing to do to ensure that there is not a threat to the

25  community.

1        And, again, I wish I had been clever enough

2  beforehand to take 200 -- to take 365 and a quarter days of the

3  year and multiply that times 28 and then add about two more

4  days to that and tell you how many days my client has been

5  alive.  It is a lot of days.  And that we're talking about this

6  one day -- these allegations pertaining to one day on July

7  the 25th of 2020.

8        I ask you, Your Honor, to fashion conditions that

9  assure you that he will not pose a threat to the community,

10  threat of harm, and that he will appear as directed.

11        Thank you, Judge Walker.

12        THE COURT:  Okay.  Mr. Buchanan?

13        MR. BUCHANAN:  Just briefly, Your Honor.  With

14  respect to the assault, the 111 count, that count is not

15  just -- it doesn't personally have a knowledge requirement of

16  whether or not the officer -- they knew that the officer was in

17  the building.  But it also criminalizes impeding, intimidating,

18  and interfering with a federal officer.  And we would posit

19  that throwing these burning objects through the door of that

20  building would satisfy that statute.

21        With respect to Smallwood, it is a Gainesville case.

22  Smallwood and four others were arrested after they shot a

23  flare -- I think one or two flares into a police vehicle.

24  Different in the amount of people involved.  Different in the

25  type of damage that was caused because of that.

1          And that case also doesn't have sort of a human

2    component to it.  This was a parked car that was away from

3    anybody.  Here, we have charged in the complaint that 111

4    count.

5          And I believe Mr. Lovell essentially mentioned it

6    with respect to Randall Mellon.  That was a gun case.  He

7    ultimately -- the way that case was, like so many others, there

8    was a review of his social media.  That social media contained

9    remarks and pictures of holding firearms.  A search warrant was

10   conducted at his house, and firearms were found.  So that is a

11   gun case.  That is different from what we have in this case.

12         Mr. Lovell mentioned the timing of the Tweets.  And

13   I'm not trying to mislead the Court into thinking that saying

14   that the burns stuff down and all of these type Tweets happened

15   in August, that they happened before the July 25th.  They

16   didn't.

17         What did happen before is Mr. Hunsinger, the account

18   we believe is his, posted publicizing this event.  At that

19   event, this arson happened.  The Tweets and re-Tweets after

20   that where he mentioned Molotov cocktails and he mentioned

21   burning stuff down, we printed those out because those are just

22   consistent with the behavior that he is charged with.  And that

23   behavior happened months before those Tweets were done.

24         With respect to Mr. Hunsinger's father serving as

25   custodian, we would -- we would argue that he is not a suitable

1    custodian.  He mentioned he hadn't seen him in a year.  He

2    mentioned that they only talked over -- several months went

3    between times when they would talk.

4           He was unaware of these other events that happened in

5    2017.  And those 2017 events, I believe, are instructive as to

6    how Mr. Hunsinger is not a suitable candidate for bond.  He

7    obviously has some issue with authority and law enforcement.

8    And that is the quintessential component of what supervised

9    release or bond is.  And his previous behavior just shows he

10   does not have it.

11          He has got an obstruction arrest.  Mr. Lovell can

12   categorize this as civil disobedience.  You know, that is his

13   right to categorize it.  But he's charged with arson.  He is

14   not charged with civil disobedience.  He is charged with

15   assaulting an officer.  He is not arrested because he is a

16   protester.  And he is charged with damaging government

17   property.

18          I would point out that this case -- the arson count

19   has a five-year mandatory minimum, which would give someone the

20   incentive to not -- to not show up.

21          And, again, Your Honor, I just point to one phrase or

22   bit of argument that Mr. Lovell used in which he noted that

23   these events happened in 2020 and there were those who felt

24   that they were without a voice.  And perhaps those folks did

25   need a voice.  That is absolutely true.  That does not give

1    anyone a right to burn down a building.  That doesn't -- that

2    is not a part of the First Amendment.  Throwing Molotov

3    cocktails through government buildings is not constitutionally

4    protected speech.

5         And so I would like to just remind the Court of why

6    we are here.  We are not here because of any views or any sort

7    of positions or any type of constitutional activity that

8    Mr. Hunsinger has participated in.  We are here because he

9    tried to burn down a building.

10        And given his history with not abiding by the rules

11   when it comes to authority, his history, not his views -- given

12   his history of that, we don't believe that he is a suitable

13   candidate for bond and he should be detained while this matter

14   is pending trial.

15        MR. LOVELL:  Judge, may I be heard again --

16        THE COURT:  Sure.

17        MR. LOVELL:  -- just briefly?

18        THE COURT:  Sure.

19        MR. LOVELL:  Thank you, Judge.

20        First, I would just like to pick up where we left

21   off.  The Government continues to ask this Court to detain my

22   client based upon charges.  They have not brought any

23   witnesses.  I have categorized that as civil disobedience, and

24   I have not categorized the charges that are before the Court

25   today as civil disobedience.  That is a -- that is not

1  accurate.  If I did, it was my error and I slipped up.  But I
2  don't believe I have.

3         But my point being is that the Government keeps
4  focusing on those three arrests.  They have not brought any
5  witnesses here.  And the record is clear that the cases were
6  not prosecuted.  They were not pursued by the State of Georgia.

7         So it is wholly -- it is very unfair for the
8  Government to keep harping on that for something that wasn't
9  pursued by the state.

10        It is clear what they thought of it.  Because if they
11 thought it was a serious crime, they would have pursued it.
12 They didn't.  They let it go.

13        I just want to touch briefly -- I don't want to --
14 you know, we're not prepared to brief this right now.  But I
15 believe there is an intent on the assault charge to demonstrate
16 that somebody intended to assault an officer.  It is the
17 classic -- you know, if I spin around -- in this room, if I
18 spin around and turn to talk to somebody and my hand flings out
19 and I hit an officer, which could happen, I didn't assault him.
20 I didn't intend to do that.  It is just -- I think that is
21 black letter law.  And the law does impose elements of intent
22 when it is not mentioned in the statute.

23        I want to go back -- the Government differentiates
24 Smallwood.  I want to -- Jesse James Smallwood.  I want to
25 point out that he also faced a five-year mandatory minimum on

1    an arson charge.

2           So that -- while we can talk about some specifics and

3    this and that and the other thing is the Government sought

4    detention in that case as well with a five-year mandatory

5    minimum he was facing.

6           And then I want to make one other thing clear.  I'm

7    not -- I did not call Robert Hunsinger to establish him as a

8    custodian.  My anticipation would be that the conditions of

9    bond will serve -- that pretrial services -- that my client

10   will report as directed; that if the Court imposes an ankle

11   monitor -- all of those things will serve to assure that he

12   abides by the Court's directives.

13          My reason for bringing Mr. Hunsinger, the father,

14   into the courtroom today was just simply to establish some

15   background but then also that he's willing to pledge his own

16   assets.  He is confident enough that his son will show up that

17   he will put his savings, his retirement on the line to

18   demonstrate his confidence.

19          And then finally, Judge, the one thing that is the

20   elephant in the room is that it is COVID.  I think there is a

21   strong basis to grant my client a bond in the absence of COVID.

22   But we really don't need more people in jail right now.

23          And for all of these reasons that we have argued

24   today, Judge, please set a bond for Mr. Hunsinger.  Thank you.

25          THE COURT:  Okay.  Thank you.

 1           Based on the information presented to the Court --

 2   first, I want to commend Mr. -- the defendant for his advocacy

 3   on behalf of the housing community.  I have read through every

 4   letter.

 5           However, despite your advocacy, at some point, your

 6   civil disobedience, your advocacy, whatever you want to call it

 7   took a dark turn and fell off the rails.  And the conduct

 8   alleged in the complaint is anti everything that the movement

 9   stands for.

10           The tossing of cinder blocks and Molotov cocktails

11   into a building and you didn't know whether or not anybody was

12   there, whether you saw the guy when he opened the door -- we

13   are very fortunate that the building didn't burn down with the

14   two individuals that were in there -- that this thing didn't

15   take an even darker turn than what we have here.

16           So based on what the Court has heard, while I was

17   considering maybe letting you stay with your father -- but I

18   did not want to do that with regard to you already having a

19   sister having to have surgery -- and just in light of what I

20   have seen in the complaint -- and this is not about First

21   Amendment.  This is about destruction of government property.

22   It had nothing to do with the things that were going on with

23   George Floyd and the community.

24           So your conduct at issue in this case shows that you

25   are a danger to the community.  So for this and other reasons,

1    the Court is going to detain you.

2            Anything else on behalf of either party?

3            MR. BUCHANAN:  Not on behalf of the United States,

4    Your Honor.

5            THE COURT:  If there is nothing else in front of the

6    Court, the court is in recess.

7            COURTROOM DEPUTY CLERK:  All rise, please.

8                    **(The audio-recorded proceedings were thereby**

9                    **concluded at 3:18 P.M.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   56 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   17th day of December, 2020.

14

15

16

17                        _____
                          SHANNON R. WELCH, RMR, CRR
18                        OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT